## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| Ray W. Askin<br>3076 Fawn Crossing Drive<br>Hilliard, OH 43026,<br><br>        Plaintiff,<br><br>      v.<br><br>Ocwen Loan Servicing, LLC<br>CSC-Lawyers Incorporating Service<br>50 W. Broad St. Suite 1800<br>Columbus, OH 43215<br><br>        Defendant. | Case No. 2:16-cv-325<br><br>Judge<br><br>Magistrate Judge<br><br>**JURY DEMAND ENDORSED HEREIN** |

### PLAINTIFF RAY W. ASKIN'S FIRST AMENDED COMPLAINT

The following allegations are based upon Plaintiff Ray W. Askin's personal knowledge, the investigation of counsel, and information and belief.  Plaintiff, through counsel, alleges as follows:

## I. INTRODUCTION

1. In a good faith effort to make proper payments on his loan, Plaintiff Ray W. Askin entered into a loan medication with Defendant Ocwen Loan Servicing, LLC (Ocwen) on or around June 16, 2012.

2. After the parties entered into the loan modification, Ocwen failed to send Mr. Askin mortgage statements.

3. Nonetheless, Mr. Askin continued to make payments under the loan modification agreement.

4. Unexpectedly, Ocwen began refusing Mr. Askin's payments.

5. Thereafter, Mr. Askin sent Defendant numerous inquiries about his mortgage loan account, to which Defendant Ocwen failed to adequately respond. Plaintiff's inquiries were Qualified Written Requests, Requests for Information, and Notices of Error pursuant to the Real Estate Settlement Procedures Act. Accordingly, Defendant is liable to Plaintiff for damages, costs, and attorneys' fees under federal law.

## II. PRELIMINARY STATEMENT

6. Plaintiff institutes this action for actual damages, statutory damages, attorneys' fees, and the costs of this action against Defendant Ocwen for violations of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601, *et seq*. and Regulation X, 12 C.F.R. § 1024.1, *et seq*.; and for violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq.*

## III. JURISDICTION

7. This Court has jurisdiction for the First Count pursuant to RESPA, 12 U.S.C. § 2614, and 28 U.S.C. §§ 1331 and 1337.

8. This Court has jurisdiction for the Second Count pursuant to the FDCPA, 15 U.S.C. § 1692k(d) and 28 U.S.C. §§ 1331 and 1337.

## IV. PARTIES

9. Plaintiff is a natural person currently residing within this Court's jurisdiction at 3076 Fawn Crossing Drive, Hilliard Ohio, 43026.

10. Plaintiff was and is a **person** within the meaning of RESPA at 12 U.S.C. § 2602(5) at all times relevant to this transaction.

11. Plaintiff was and is a **consumer** within the meaning of the FDCPA at 15 U.S.C. § 1692a(3).

* * *

2

12. Defendant Ocwen is a Limited Liability Company organized under the laws of the State of Delaware, with its principal address in Florida.

13. Defendant Ocwen was and is a **person** within the meaning of RESPA at 12 U.S.C. § 2602(5) at all times relevant to this transaction.

14. Defendant Ocwen was and is a loan **servicer** of Plaintiff's **federally related mortgage loan** within the meaning of those terms in RESPA at 12 U.S.C. §§ 2605(i)(2) and 2602(1), respectfully, at all times relevant to this transaction.

15. Defendant Ocwen was and is a **debt collector** within the meaning of the FDCPA at 15 U.S.C. § 1692a(6).

## V. FACTUAL ALLEGATIONS

16. Plaintiff incorporates all other paragraphs in this Complaint by reference as though fully written here.

17. Plaintiff entered into a mortgage loan agreement and signed a promissory note on or about February 23, 2006, which was secured by a mortgage lien on real property Plaintiff owns as his principal primary residence. A copy of the Note is attached as Exhibit A, and the Mortgage as Exhibit B.

18. Further, the mortgage loan was and is a **federally related mortgage loan** within the meaning of RESPA at 12 U.S.C. §§ 2605(i)(2) and 2602(1).

19. Ocwen obtained its rights to the loan, if any, on April 7, 2012.

20. Ocwen alleges that the loan was in default and due for the February 1, 2010 payment.

21. Ocwen obtained this loan while it was allegedly in default.

22. Ocwen treated the loan as if it were in default.

23. Plaintiff entered into a loan modification agreement on June 16, 2012. A copy of the loan modification agreement is attached as Exhibit C.

24. Under the terms of the Loan Modification Agreement Mr. Askin was supposed to make an initial payment of $1,752.63 in June of 2012, and then make monthly payments of $1,139.54.

25. On or around June of 2012 Mr. Askin paid $1,752.63, and thereafter continued making monthly payments of $1,139.54.

26. Mr. Askin's previous counsel emailed Defendant's counsel to ascertain whether this $1,139.54 payment included taxes and insurance. A copy of the e-mail exchange is attached as Exhibit D.

27. Defendant told Mr. Askin that this $1,139.54 did in fact include taxes and insurance. *See* Exhibit D.

28. Mr. Askin made monthly payments to Defendant Ocwen for over one and a half years which Ocwen accepted.

29. During this period, Ocwen never contacted Plaintiff to inform him of the alleged discrepancy between the payment Plaintiff was making, and the payment that Ocwen allegedly expected.

30. On January 26, 2015, Mr. Askin's former counsel sent a QWR, requesting a periodic statement payment due on March 1, 2014.

31. Ocwen's February 12, 2015 response merely stated that their records indicated the last account statement was sent January 2, 2015, to counsel's address.

32. Ocwen failed to adequately respond by not explaining that it did not have such periodic statement nor did it provide a reason it could not provide such account statement.

33. On February 17, 2015 Mr. Askin's prior counsel sent a letter requesting a periodic statement payment due April 1, 2014.

34. Ocwen's February 26, 2015 response merely stated that according to Ocwen's records, recent account statements were sent on January 2, 2015 and February 16, 2015 to counsel's address.

35. Ocwen failed to adequately respond by not explaining that it did not have such periodic statement nor did it provide a reason it could not provide such account statement.

36. On March 6, 2015, Mr. Askin's prior counsel sent another letter which specifically addressed Ocwen's February 26, 2015 response; this letter directly stated that not a single mortgage statement had been received.

37. Mr. Askin never received a response from the March 6, 2015 QWR, in violation of the RESPA.

38. On March 18, 2015, Mr. Askin's prior counsel sent another letter requesting a periodic statement payment due May 1, 2014.

39. Ocwen responded on March 30, 2015 apologizing for its inability to provide an account statement for the month of May 1, 2014.

40. Ocwen, however, did not provide an explanation for its inability to provide an account statement for the month of May 1, 2014, in violation of the RESPA.

41. Mr. Askin's prior counsel sent two more letters, one on April 7, 2015, and the other on April 16, 2015, in which prior counsel requested statements for June 1, 2014 and July 1, 2014, respectively.

42. Ocwen responded by admitting that it ceased sending account statements on April 13, 2012, and that statements were being generated and sent from January 1, 2015.

43. Ocwen has never explained why periodic statements were not sent after the June 2012 loan modification.

44. On or about August 26, 2015, Plaintiff's counsel, on behalf of Plaintiff, mailed Ocwen a Qualified Written Request ("QWR"). (Exhibit E).

45. The postage and copying cost that Plaintiff incurred mailing the QWR via certified mail are actual damages.

46. The cost of counsel's time preparing that QWR are actual damages.

47. The August 26, 2015 QWR disputed the following:

     a. past due amount;

     b. outstanding principal;

     c. negative escrow balance;

     d. late fees;

     e. charges;

     f. inspection fees;

     g. property appraisal fees;

     h. forced placed insurance charges;

     i. legal fees;

     j. corporate advances;

     k. Defendant Ocwen's application of payments; and

     l. Defendant Ocwen charged excessive fees and interest.

48. The August 26, 2015 QWR also requested additional information and documentation.

49. Ocwen failed to sufficiently respond to the requests made in the QWR.

50. On or about August 26, 2015, Plaintiff also, by separate cover, disputed the validity of the debt that Defendant Ocwen claimed due and asked for verification of the same.

* * *

6

51. Defendant Ocwen received the QWR on or about August 30, 2015.

52. On or about September 3, 2015, Defendant Ocwen acknowledged receipt of the QWR. (Exhibit F). Therein, Defendant Ocwen identified itself as a **debt collector** and stated it would respond to Plaintiff's correspondence.

53. Defendant Ocwen's response to Plaintiff's August 26, 2015 QWR was deficient. (Exhibit F).

54. The notice of error in Plaintiff's August 26, 2015 QWR stated that Plaintiff disputed the past due amount because Plaintiff consistently made his monthly payments after entering into the loan modification.

55. Defendant Ocwen did not correct the errors Plaintiff identified with his account.

56. Defendant Ocwen did not explain why Plaintiff's consistent monthly loan modification payments were allegedly insufficient and allegedly did not satisfy Plaintiff's payment obligation.

57. Defendant Ocwen did not address the errors discussed in Plaintiff's August 26, 2015 QWR, specifically those relating to the disputed past due amount, outstanding principal, or negative escrow.

58. Defendant Ocwen failed to provide the information and documents which were requested in Plaintiff's August 26, 2015 QWR, including:

    a. Defendant Ocwen did not provide a complete payment history for the mortgage loan showing how payments and charges were applied, including the amounts applied to principal, interest, escrow and other charges;

    b. Defendant Ocwen did not provide the current physical location of note;

    c. Defendant Ocwen did not provide the current interest rate on the loan and an accounting for any adjustments;

    d.   Defendant Ocwen did not send invoices for the legal fees relating to Plaintiff's account; and

    e.   Defendant Ocwen did not send a copy of all written correspondence with Plaintiff from January 1, 2012 until present which address Plaintiff's alleged delinquency or default.

59. While Plaintiff was attempting to discern from Defendant Ocwen why his monthly payments were suddenly being rejected, a foreclosure action was instituted against Plaintiff in state court.

60. Ocwen sent a delinquency notice on or around April 22, 2015 which contained false allegations as to the character, amount, or legal status of Mr. Askin's alleged debt.

61. Ocwen sent a delinquency notice on or around May 21, 2015 which contained false allegations as to the character, amount, or legal status of Mr. Askin's alleged debt.

62. Ocwen sent a delinquency notice on or around June 17, 2015 which contained false allegations as to the character, amount, or legal status of Mr. Askin's alleged debt.

63. Ocwen sent a mortgage statement on or around May 2015 which contained false allegations as to the character, amount, or legal status of Mr. Askin's alleged debt.

64. Ocwen sent a mortgage statement on or around June 2015 which contained false allegations as to the character, amount, or legal status of Mr. Askin's alleged debt.

65. Ocwen sent a mortgage statement on or around June 2015 which contained false allegations as to the character, amount, or legal status of Mr. Askin's alleged debt.

66. Ocwen has placed fees and other charges on Mr. Askin's account which are unauthorized, unjustifiable, and are not allowed by the note, mortgage, or loan modification.

67. Ocwen has sent correspondence attempting to collect these unauthorized fees.

## VI. FIRST COUNT - RESPA

68. Plaintiff incorporates all other paragraphs in this Complaint by reference as though fully written here.

69. For all the reasons stated herein, Defendant Ocwen violated RESPA and is liable to Plaintiff for damages.

70. By failing to adequately respond to Mr. Askin's August 26, 2015 QWR, and the numerous QWRs sent by Mr. Askin's previous counsel, Defendant Ocwen violated RESPA at 12 U.S.C. § 2605(e)(2); 12 C.F.R. § 1024.35(e); 12 C.F.R. § 1024.36(d).

71. By failing to correct Mr. Askin's account Defendant Ocwen violated RESPA at 12 U.S.C. § 2605(e)(2).

72. By failing to conduct an investigation of Mr. Askin's account after receiving the QWR letters, Defendant Ocwen violated RESPA at 12 U.S.C. § 2605(e)(2)(B) and (C), 12 C.F.R. § 1024.35(e); 12 C.F.R. § 1024.36(d).

73. By failing to provide Mr. Askin a written explanation that included a reason why it believed his account to be correct, plus the name and telephone number of an individual employed by Ocwen who could provide assistance to Mr. Askin, Defendant Ocwen violated RESPA at 12 U.S.C. § 2605(e)(2), 12 C.F.R. § 1024.35(e).

74. By failing to provide Mr. Askin with the information requested, Defendant Ocwen violated Regulation X at 12 C.F.R. § 1024.36(d).

75. Defendant Ocwen has engaged in a pattern or practice of non-compliance with the requirements of the mortgage servicer provisions of RESPA as set forth in 12 U.S.C. § 2605, and Regulation X at 12 C.F.R. § 1024.35(e) and 12 C.F.R. § 1024.36(d).

76. Due to these violations, Defendant Ocwen is liable to Plaintiff in the amount of her actual damages in excess of $5,000, additional damages in the amount of at least $2,000, plus attorneys' fees, and costs of the action, including pursuant to 12 U.S.C. § 2605(f).

## VII. SECOND COUNT - FDCPA

77. Plaintiff incorporates all other paragraphs in this Complaint by reference as though fully written here.

78. Defendant Ocwen was and is subject to the FDCPA at all relevant times.

79. Defendant Ocwen acquired Plaintiff's mortgage loan after it was in default.

80. Defendant Ocwen violated the FDCPA.

81. Defendant Ocwen's actions discussed throughout this complaint are in violation of 15 USC § 1692 *et seq.*

82. Defendant Ocwen's actions stated herein are false, deceptive, or misleading representations in connection with the collection of the debt in violation of 15 U.S.C. § 1692e(2), (5), and (10).

83. Defendant Ocwen falsely and deceptively represented to Mr. Askin the he was to pay 1,139.54 and then claimed he was in default almost two years after he was making timely payments in violation of 15 U.S.C. § 1692e(2),(5), and (10).

84. Defendant Ocwen's actions stated herein are attempts to collect amounts and fees not expressly authorized, in violation of 15 U.S.C. § 1692f(1).

85. Defendant Ocwen further filed a wrongful foreclosure in state court to collect on this debt, in violation of 15 U.S.C. § 1692f.

86. Plaintiff has suffered emotional distress, anxiety, and sleepless nights as a result of Defendant Ocwen's actions.

87. Defendant Ocwen is liable to Plaintiff in the amount of his actual damages in excess of $5,000, statutory damages in the amount of at least $2,000, plus attorneys' fees, and costs of the action, including pursuant to 15 U.S.C. § 1692k(a).

## IX. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays that this Court:

88. Assume jurisdiction of this case;

89. Award Plaintiff maximum actual, economic, non-economic, statutory, punitive, and other damages allowable under the law;

90. Award Plaintiff actual damages to be established at trial including pursuant to 12 U.S.C. § 2605(f) and 15 U.S.C. § 1692(k)(a)(1);

91. Award Plaintiff statutory damages in the amount of at least $2,000, plus attorneys' fees, and costs of the action, including pursuant to 12 U.S.C. § 2605(f);

92. Award Plaintiff statutory damages in the amount of at least $1,000, plus attorneys' fees, and costs of the action, including pursuant to 15 U.S.C. § 1692k(a)(2)(A);

93. Award Plaintiff additional damages and costs;

94. Declare that Defendant Ocwen's acts and practices violate RESPA and the FDCPA; and

95. Award such other relief as the Court deems appropriate.

Dated October 19, 2016

Respectfully Submitted,
DOUCET & ASSOCIATES CO., LPA


/s/ Alexis Hutta_____
Alexis Hutta, of Counsel (0093306)
*Attorney for Plaintiff Ray W. Askin*
700 Stonehenge Parkway, Second Floor

Dublin, Ohio 43017
P: (614) 944-5219
F: (818) 538-5548
alexis@troydoucet.com

## JURY TRIAL DEMANDED

Plaintiff respectfully requests a jury trial on all triable issues.


_s/ Alexis Hutta_____
Alexis Hutta (0093306)

# ADJUSTABLE RATE NOTE
### (LIBOR Six-Month Index (As Published in *The Wall Street Journal*)-Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

FEBRUARY 23, 2006      INDEPENDENCE      OHIO
    [Date]                [City]          [State]

     3076 FAWN CROSSING DRIVE, HILLIARD, OHIO 43026
                       [Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $229,500.00      (this amount is called "Principal"), plus interest, to the order of Lender. Lender is NOVASTAR MORTGAGE, INC., A VIRGINIA CORPORATION

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of      10.350   %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the   1st   day of each month beginning on    APRIL 1 2006  . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on MARCH 1, 2036    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. BOX 808911, KANSAS CITY, MISSOURI 64184--8911
                       or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $ 2,073.63    . This amount may change.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

MULTISTATE ADJUSTABLE RATE NOTE--LIBOR SIX-MONTH INDEX
(AS PUBLISHED IN *THE WALL STREET JOURNAL*)--Single Family
Fannie Mae MODIFIED INSTRUMENT      Page 1 of 5

Form 3520 1/01
DocMagic *eForms* 800-649-1362
www.docmagic.com

EXHIBIT A

0C557 - Q30
Franklin County Ohio Clerk of Courts of the Common Pleas- 2015 Jun 22 9:28 AM-15CV005294
Case 2:19-cv-00525-EPD Doc #: 1-7 Filed: 12/20/18 Page: 14 of 50 PAGEID #: 393

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the 1st day of MARCH, 2008 , and on that day every 6th month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new Index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding SIX AND 250/1000 percentage points ( 6.250 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 13.350 % or less than 10.350 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than ONE AND 000/1000 percentage point(s) ( 1.000 %) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 17.350 %. My interest rate will never be less than 10.350 %.

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY ** See attached Prepayment Note Addendum.

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

MULTISTATE ADJUSTABLE RATE NOTE--LIBOR SIX-MONTH INDEX
(AS PUBLISHED IN *THE WALL STREET JOURNAL*)--Single Family
Fannie Mae MODIFIED INSTRUMENT                    Page 2 of 5

Form 3520 1/01
*DocMagic* ℰℱℴ𝓇𝓂𝓈 800-649-1362
www.docmagic.com

## 6.   LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me.  The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me.  If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7.   BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of   15 calendar days after the date it is due, I will pay a late charge to the Note Holder.  The amount of the charge will be   5.000  % of my overdue payment of principal and interest.  I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount.  That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  Those expenses include, for example, reasonable attorneys' fees.

## 8.   GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed.  Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things.  Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note.  The Note Holder may enforce its rights under this Note against each person individually or against all of us together.  This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10.  WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor.  "Presentment" means the right to require the Note Holder to demand payment of amounts due.  "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

---

MULTISTATE ADJUSTABLE RATE NOTE--LIBOR SIX-MONTH INDEX
(AS PUBLISHED IN *THE WALL STREET JOURNAL*)--Single Family
Fannie Mae MODIFIED INSTRUMENT                 Page 3 of 5

Form 3520 1/01
DocMagic eFermes 800-649-1362
www.docmagic.com

Franklin County Ohio Clerk of Courts of the Common Pleas- 2015 Jun 22 9:28 AM-15CV005294
Case: 2:19-cv-00325-EPD Doc #: 1-7 Filed: 11/20/19 Page: 16 of 50 PAGEID #: 320
0C557 - Q32

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

MULTISTATE ADJUSTABLE RATE NOTE--LIBOR SIX-MONTH INDEX
(AS PUBLISHED IN *THE WALL STREET JOURNAL*)--Single Family
Fannie Mae MODIFIED INSTRUMENT                    Page 4 of 5

Form 3520 1/01
DocMagic *eForms* 800-649-1362
www.docmagic.com

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
RAY W ASKIN            -Borrower                                -Borrower

_____ (Seal)          _____ (Seal)
                       -Borrower                                -Borrower

_____ (Seal)          _____ (Seal)
                       -Borrower                                -Borrower

Pay to the order of: *    * The Bank of New York Mellon, as
                          Successor Indenture Trustee under
                          NovaStar Mortgage Funding Trust,
                          Series 2006-1

WITHOUT RECOURSE
NovaStar Mortgage, Inc.
A Virginia Corporation

David A. Pazgan, Sr Vice President
Kathleen Shanluk, Vice President

[Sign Original Only]

MULTISTATE ADJUSTABLE RATE NOTE--LIBOR SIX-MONTH INDEX
(AS PUBLISHED IN *THE WALL STREET JOURNAL*)--Single Family
Fannie Mae MODIFIED INSTRUMENT          Page 5 of 5

Form 3520 1/01
DocMagic eForms 800-649-1362
www.docmagic.com

# PREPAYMENT ADDENDUM TO NOTE

Date: FEBRUARY 23, 2006

Borrower(s): RAY W ASKIN

THIS PREPAYMENT ADDENDUM TO NOTE (the "Addendum") is made this **23rd** day of FEBRUARY, 2006 , and is incorporated into and shall be deemed to amend and supplement that certain promissory note (the "Note") made by the undersigned ("Borrower") in favor of NOVASTAR MORTGAGE, INC., A VIRGINIA CORPORATION

("Lender") and dated the same date as this Addendum. Repayment of the Note is secured by a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") given by Borrower in favor of Lender and dated the same date as this Addendum. To the extent that the provisions of this Addendum are inconsistent with the provisions of the Note, the provisions of this Addendum shall supersede the inconsistent provisions of the Note.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Note, Borrower and Lender further covenant and agree as follows:

Section 5 of the Note is amended to read in its entirety as follows:

## 5 . BORROWER'S RIGHT TO PREPAY; PREPAYMENT CHARGE

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under the Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to those changes.

If the Note provides for changes in the interest rate, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

If within TWENTY-FOUR ( 24 ) months from the date the Security Instrument is executed I make a full Prepayment, I will pay a Prepayment charge in an amount equal to ONE percent ( 1.000 %) of the original Principal amount of the residential mortgage.

OHIO PREPAYMENT ADDENDUM TO NOTE -
FIRST LIEN/JUNIOR LIEN OPTION A
6/03

Page 1 of 2

*DocMagic* 800-649-1362
www.docmagic.com

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Addendum.

_____  2-23-06
Borrower RAY W ASKIN            Date

_____
Borrower                       Date

_____
Borrower                       Date

_____
Borrower                       Date

_____
Borrower                       Date

_____
Borrower                       Date

After Recording Return To:
NOVASTAR MORTGAGE, INC.
6200 OAK TREE BLVD. THIRD FLOOR
INDEPENDENCE, OHIO 44131
Loan Number: ▮▮▮▮▮▮▮

200603060042117
Pgs  19  $184.00  T200600015768
03/06/2006 4:36PM  BATTALION GROUP
Robert G  Montgomery
Franklin County Recorder

------------------ [Space Above This Line For Recording Data] ------------------

# MORTGAGE

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated FEBRUARY 23, 2006 , together with all Riders to this document.
(B) "Borrower" is RAY W ASKIN, MARRIED

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(D) "Lender" is NOVASTAR MORTGAGE, INC.

Lender is a CORPORATION                                    organized
and existing under the laws of VIRGINIA
Lender's address is 6200 OAK TREE BLVD. THIRD FLOOR, INDEPENDENCE, OHIO 44131

(E) "Note" means the promissory note signed by Borrower and dated FEBRUARY 23, 2006
The Note states that Borrower owes Lender TWO HUNDRED TWENTY-NINE THOUSAND FIVE HUNDRED AND 00/100                    Dollars (U.S. $ 229,500.00    ) plus interest.
Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than MARCH 1, 2036
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

OHIO—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3036 01/01
With Authorized Changes                    Page 1 of 13                    DocMagic eForms 800-849-1362
                                                                            www.docmagic.com

EXHIBIT B

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☒ Adjustable Rate Rider    ☐ Condominium Rider    ☐ Second Home Rider

☐ Balloon Rider    ☐ Planned Unit Development Rider    ☒ Other(s) [specify]

☐ 1-4 Family Rider    ☐ Biweekly Payment Rider    PREPAYMENT RIDER TO SECURITY INST

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the

COUNTY      of      FRANKLIN      :
[Type of Recording Jurisdiction]      [Name of Recording Jurisdiction]

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF. (STATE: OHIO, COUNTY: FRANKLIN)

OHIO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3036 01/01
With Authorized Changes      Page 2 of 13

DocMagic EForms 800-649-1362
www.docmagic.com

which currently has the address of 3076 FAWN CROSSING DRIVE

[Street]

HILLIARD , Ohio 43026 ("Property Address"):

[City] [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

OHIO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3036 01/01
With Authorized Changes
Page 3 of 13

DocMagic EForms 800-649-1362
www.docmagic.com

Franklin County Ohio Clerk of Courts of the Common Pleas- 2015 Jun 22 9:28 AM-15CV005294

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower

OHIO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3036 01/01
With Authorized Changes
Page 4 of 13

DocMagic €Forms 800-649-1362
www.docmagic.com

shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower. Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration

OHIO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3036 01/01
With Authorized Changes                        Page 5 of 13

DocMagic EForms  800-649-1362
www.docmagic.com

or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

    6.  Occupancy.  Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

    7.  Preservation, Maintenance and Protection of the Property; Inspections.  Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

    Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

    8.  Borrower's Loan Application.  Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

    9.  Protection of Lender's Interest in the Property and Rights Under this Security Instrument.  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the

OHIO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3036 01/01
With Authorized Changes                          Page 6 of 13

DocMagic EForms 800-649-1362
www.docmagic.com

Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

OHIO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3036 01/01
With Authorized Changes

Page 7 of 13

DocMagic eForms 800-649-1362
www.docmagic.com

0C557 - Q43
Franklin County Ohio Clerk of Courts of the Common Pleas- 2015 Jun 22 9:28 AM-15CV005294
Case: 2:14-cv-00325 Filed: 12/20/16 Page: 27 of 50 PAGEID #: 321

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

OHIO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3036 01/01
With Authorized Changes

Page 8 of 13

DocMagic EForms 800-649-1362
www.docmagic.com

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender.

OHIO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3036 01/01
With Authorized Changes                          Page 9 of 13

DocMagic EForms 800-649-1362
www.docmagic.com

If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other

OHIO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3036 01/01
With Authorized Changes

Page 10 of 13

DocMagic EFarms 800-649-1362
www.docmagic.com

information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified

---

OHIO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3036 01/01
With Authorized Changes
Page 11 of 13

DocMagic EForms 800-649-1362
www.docmagic.com

Franklin County Ohio Clerk of Courts of the Common Pleas- 2015 Jun 22 9:28 AM-15CV005294
Case: 2:19-cv-00325-EPD Doc #: 1 Filed: 12/20/18 Page: 31 of 50 PAGEID #: 325

in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, costs of title evidence.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Certain Other Advances. In addition to any other sum secured hereby, this Security Instrument shall also secure the unpaid principal balance of, plus accrued interest on, any amount of money loaned, advanced or paid by Lender to or for the account and benefit of Borrower, after this Security Instrument is delivered to and filed with the Recorder's Office, FRANKLIN County, Ohio, for recording. Lender may make such advances in order to pay any real estate taxes and assessments, insurance premiums plus all other costs and expenses incurred in connection with the operation, protection or preservation of the Property, including to cure Borrower's defaults by making any such payments which Borrower should have paid as provided in this Security Instrument, it being intended by this Section 24 to acknowledge, affirm and comply with the provision of § 5301.233 of the Revised Code of Ohio.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Executed this 23rd day of February, 2006

_____ (Seal)
RAY W ASKIN            -Borrower

_____ (Seal)
LINDA ASKIN            -Borrower
SIGNING SOLELY TO RELEASE HER
DOWER INTEREST

_____ (Seal)
                      -Borrower

_____ (Seal)
                      -Borrower

_____ (Seal)
                      -Borrower

_____ (Seal)
                      -Borrower

LINDA ASKIN, WIFE OF RAY W. ASKIN, IS SIGNING SOLELY TO RELEASE HER DOWER INTEREST

OHIO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3036 01/01
With Authorized Changes          Page 12 of 13

DocMagic eForms 800-649-1362
www.docmagic.com

(Execution in accordance with Chapter 5301 of the Revised Code.)

State of Ohio          )
                          ) ss.

County of FRANKLIN    )

      The foregoing instrument was acknowledged before me this
by  RAY W ASKIN, LINDA ASKIN

**JAMES A. MAGNUSON JR.**
Notary Public, State of Ohio
My Commission Expires 08-24-07

_____
Signature of Person Taking Acknowledgment

_____
Title

_____
Serial Number, if any

        (Seal)            My commission expires:

This Instrument Prepared By:

NOVASTAR MORTGAGE, INC.

OHIO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3036 01/01
With Authorized Changes           Page 13 of 13

*DocMagic* 800-649-1362
www.docmagic.com

# EXHIBIT A

## LEGAL DESCRIPTION

Real property in the City of Columbus, County of Franklin, State of Ohio, and is described as follows:

Being Lot Number Sixty-four (64) of WESTBROOKE PARK SECTION 2, as the same is numbered and delineated upon the recorded plat thereof, of record in Plat Book 89, Pages 46 and 47, Recorder's Office, Franklin County, Ohio, plus a 0.003 acre tract as described as follows:

DESCRIPTION OF A 0.003 ACRE AREA OF LAND OUT OF LOT NO. 65 OF WESTBROOKE PARK SECTION 2 LOCATED ON THE EASTERLY SIDE OF PAWN CROSSING DRIVE AND SOUTH OF ANCESTOR DRIVE IN THE CITY OF COLUMBUS, COUNTY OF FRANKLIN, STATE OF OHIO:

Situated in the State of Ohio, County of Franklin, City of Columbus, being in Virginia Military Survey No. 6642 and being a 0.003 acre (133 square feet) area of land, more or less out of Lot No. 65 as the same is numbered and delineated upon the recorded plat of Westbrooke Park Section 2, of record in Plat Book 89, Pages 46 and 47, Recorder's Office, Franklin County, Ohio, said 0.003 acre area of land being more particularly described as follows:

Beginning at a 3/4 inch (I.D.) iron pipe set in the easterly right of way line of Fawn Crossing Drive, fifty feet in width, at the northwesterly corner of said Lot No. 65, the same being the southwesterly corner of Lot No. 64 of said Westbrooke Park Section 2;

Thence S 76 deg. 48' 00" E, with the northerly line of said Lot No. 65 and with the southerly line of said Lot No. 64, a distance of 133.42 feet to a 3/4 inch (I.D.) iron pipe set at the northeasterly corner of said Lot No. 65, the same being the southwesterly corner of said Lot No. 64;

Thence S 0 deg. 12' 19" W, with the easterly line of said Lot No. 65, a distance of 1.03 feet to a 3/4 inch (I.D.) iron pipe set;

Thence N 76 deg. 48' 00" W, parallel with and 1.00 feet southerly from, as measured at right angles, both the northerly line of said Lot No. 65 and the southerly line of said Lot No. 64, a distance of 133.42 feet to a 3/4 inch (I.D.) iron pipe set in the easterly right of way line of said Fawn Crossing Drive, the same being in the westerly line of said Lot No. 65;

Thence N 0 deg. 12' 19" E with the easterly right of way line of said Fawn Crossing Drive and with the westerly line of said Lot No. 65, a distance of 1.03 feet to the point of beginning and being a 0.003 acre (133 square feet) area of land, more or less.

We hereby state that the foregoing description was prepared from information obtained from an actual field survey conducted by Bauer, Davidson & Merchant, Inc. in October of 2001.

The bearings given in the foregoing description are based on the bearing of S 0 deg. 12' 19" W as given for the centerline of Fawn Crossing Drive and shown on the recorded plat of Westbrooke Park Section 2, of record in Plat Book 89, Pages 46 and 47, Recorder's Office, Franklin County, Ohio.

560-245051



Ocwen Loan Servicing, LLC
P.O. Box 24737
West Palm Beach, Florida 33416-4737
(Do not send correspondence or payments to the above address.)

OCWEN

WWW.OCWEN.COM

RECEIVED
JUN 27 2012
BY:

## PAYMENT REMITTANCE INFORMATION

### PLEASE DON'T FORGET TO:

1. Make checks payable to Ocwen Loan Servicing, LLC.
2. Always include your loan number with your payment.
3. The down payment must be in the form of certified funds.

### OVERNIGHT DELIVERY
### (Money Order & Certified Checks Only)
OCWEN LOAN SERVICING, LLC
ATTN: CASHIERING DEPARTMENT
1661 Worthington Road, Suite 100
West Palm Beach, FL 33409

**MONEY GRAM**
RECEIVER CODE: 2355
PAYABLE TO: OCWEN LOAN SERVICING, LLC
CITY: ORLANDO
STATE: FLORIDA
REFERENCE: LOAN NUMBER ▮▮▮▮▮
AGENT LOCATER: (800) 926-9400

**BY WUQC**
Code City: Ocwen
State: FL
Reference: Loan # ▮▮▮▮▮

**BANK WIRE**
BANK: Wells Fargo Bank, NA
San Francisco, California
ABA: ▮▮▮▮▮
ACCOUNT NAME: Ocwen Loan Servicing, LLC
ACCOUNT NUMBER: ▮▮▮▮▮
REFERENCE: Loan Number, Property Address,
and Borrower Name
Email: Transferfunds@ocwen.com with the details
of the wire.

## LOAN MODIFICATION AGREEMENT

Ocwen Loan Servicing, LLC ("Ocwen") is offering you this Loan Modification Agreement ("Agreement"), dated 06/05/12, which modifies the terms of your home loan obligations as described in detail below:

A.  the Mortgage, Deed of Trust, or Security Deed (the "Mortgage"), dated and recorded in the public records of Franklin County, and

B.  the Note, of the same date and secured by the Mortgage, which covers the real and personal property described in the Mortgage and defined therein as the "Property", located at 3076 Fawn Xing Dr Hilliard, OH 43026.

Pursuant to our mutual agreement to modify your Note and Mortgage and in consideration of the promises, conditions, and terms set forth below, the parties agree as follows:

1.  You agree that the new principal balance due under your modified Note and the Mortgage will be $209,000.00. Upon modification, your Note will become contractually current; however fees and charges that were not included in this principal balance will be your responsibility.

2.  You promise to make an initial payment in the amount of $1,752.63 on or before 6/18/12, after which you will commence payments of principal and interest in the amount of $1,139.54 beginning on 8/1/12 and continuing on the same day of each succeeding month until all amounts owed under the Note and Modification are paid in full.

3.  Any payments due for taxes and insurance will be your responsibility in addition to the payments of principal and interest required under the terms of this modification. If this loan is currently escrowed, Ocwen will continue to collect the required escrow amounts with your monthly principal and interest payment.

▮▮▮▮▮

410414

This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is not intended as and does not constitute an attempt to collect a debt.

NMLS # 1852

# EXHIBIT C



*Ocwen Loan Servicing, LLC*
*P.O. Box 24737*
*West Palm Beach, Florida 33416-4737*
*(Do not send correspondence or payments to the above address.)*                    <u>WWW.OCWEN.COM</u>

---

4.  Upon Modification, the annual rate of interest charged on the unpaid principal balance of your loan will be 4.0000%. This rate will remain in effect until the maturity date of your loan.

5.  If you sell your property, refinance or otherwise payoff your loan during the 12 months following the date of Modification, the Modification will be voidable at the sole option of Ocwen and all amounts owed under the obligations existing prior to the Modification will be due and owing.

6.  You understand and agree that:

    (a) All the rights and remedies, stipulations and conditions contained in your Mortgage relating to default in the making of payments under the Mortgage will also apply to default in the making of the modified payments hereunder.

    (b) All covenants, agreements, stipulations and conditions in your Note and Mortgage will remain in full force and effect, except as herein modified, and none of the your obligations or liabilities under your Note and Mortgage will be diminished or released by any provisions hereof, nor will this Agreement in any way impair, diminish or affect any of Ocwen's rights under or remedies on your Note and Mortgage, whether such rights or remedies arise there under or by operation of law. Also, all rights of recourse to which Ocwen is presently entitled against any property or any other persons in any way obligated for, or liable on, your Note and Mortgage are expressly reserved by Ocwen.

    (c) Any expenses incurred in connection with the servicing of your loan, but not yet charged to your account as of the date of this Agreement, may be charged to your account after the date of this Agreement.

    (d) Nothing in this Agreement will be understood or construed to be a satisfaction or release in whole or in part of your Note and Mortgage.

    (e) You agree to make and execute such other documents or papers as may be necessary or required to effectuate the terms and conditions of this Agreement which, if approved and accepted by Ocwen, will bind and inure to your heirs, executors, administrators, and assigns.

    (f) You understand that this agreement is legally binding and that it affects your rights. You confirm that you have had the opportunity to obtain, independent legal counsel concerning this Agreement and are signing this Agreement voluntarily and with full understanding of its contents and meaning.

    (g) Corrections and Omissions: You agree to execute such other and further documents as may be reasonably necessary to consummate the transactions contemplated herein or to perfect the liens and security interests intended to secure the payment of the loan evidenced by the Note.

---

Ocwen Loan Servicing, LLC

By: _____

*Ray U. Askin*
Ray W Askin

*Ray W. Askin*      6-16-2012

---

*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is not intended as and does not constitute an attempt to collect a debt.*

NMLS # 1852

410414



Ocwen Loan Servicing, LLC
P.O. Box 24737
West Palm Beach, Florida 33416-4737
(Do not send correspondence or payments to the above address.)

WWW.OCWEN.COM

06/05/12

Ray W Askin

P O Box 182
Hilliard, OH 43026

Loan Number: ▮▮▮▮▮▮▮
Property Address: 3076 Fawn Xing Dr
Hilliard, OH 43026

## PROPOSED MODIFICATION AGREEMENT

Dear Borrower(s):

Enclosed please find a proposed modification agreement (the "Agreement") on your loan referenced above for your review and consideration.

In order to accept this modification on your loan, you must complete ALL of the following steps **on or before 6/18/12,** ("Due Date"):

1. **SIGN** the bottom of the Agreement on the line(s) for the Borrower(s);

2. **FAX** the fully executed Agreement to:     Attention: Home Retention Department
                                                              (407) 737-5693

3. **PAY** the full down payment in the amount of:     $ 1,752.63
                                                              [*See Payment Instructions Attached*]

4. **NEW MONTHLY PAYMENT:**
Principal and Interest Payment               $1,139.54
Total **(which may or may not include escrow)**     $1,752.63
                                                        starting on 8/1/12

5. **SEND** proof of insurance coverage*     Attention: Escrow Department
                                                              Fax: (888) 882 -1816
                                                              E-mail: updateinsuranceinfo@ocwen.com

\* <u>Proof of insurance and the Agreement must be sent separately to the correct departments using the fax numbers provided above.</u> Failure to send proof of insurance coverage before the Due Date will constitute acceptance of a force placed policy *and agreement to pay the costs of such force placed policy, so long as all other items are complete.*

Time is of the essence on this offer. If ALL of the items above are not completed by the Due Date, which includes the receipt of an executed counterpart to the Agreement signed by all parties, the Agreement will have no force or effect and the original terms of your note will apply. Any down payment received will be applied in accordance with the original terms of your loan agreement. Please be advised that Ocwen Loan Servicing, LLC will not delay, postpone or otherwise stop any collection efforts until ALL of the steps above have been completed.

If you have any questions or require additional information, please contact the Customer Care Center directly at (800) 746-2936.

Sincerely,

Ocwen Loan Servicing, LLC

▮▮▮▮▮▮▮

410414

This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is not intended as and does not constitute an attempt to collect a debt.

NMLS # 1852

Subject:  FW: Bank of New York Mellon vs. Ray Askin 11CV-00-4040:

From:    Kathy Akin (kakin@cozmyklaw.com)

To:      ray.askin@yahoo.com;

Date:    Friday, June 15, 2012 11:08 AM

Here's the email confirmation you requested.

*Kathy Akin*

Kathy Akin

**Client Services**

Cozmyk Law Offices, LLC

6100 Oak Tree Boulevard

Suite 200

Independence, OH 44131

Phone   (877) 570-4440

Fax      (216) 672-5261

kakin@cozmyklaw.com



# Exhibit D



**From:** Samantha K. Salzgaber [mailto:sks@mdk-llc.com]
**Sent:** Thursday, June 14, 2012 12:45 PM
**To:** Chris Trionfo
**Cc:** Kyle E. Timken
**Subject:** RE: Bank of New York Mellon vs. Ray Askin 11CV-00-4040:


Chris,


Our client has verified that the payment does include the taxes and insurance.  Please let me know if you need anything else.


Thanks,

Sam


**Samantha K. Salzgaber**

Paralegal | Kyle E. Timken, Esq.

Manley Deas Kochalski LLC

P.O. Box 165028

Columbus, OH 43216

Phone | Fax: 614-917-1865

sks@mdk-llc.com


**From:** Chris Trionfo [mailto:ctrionfo@cozmyklaw.com]
**Sent:** Thursday, June 14, 2012 11:53 AM
**To:** Samantha K. Salzgaber
**Subject:** Bank of New York Mellon vs. Ray Askin 11CV-00-4040:

Hi Samantha,

We are trying to ascertain if the payment on the loan modification sent to us for this client includes taxes and insurance. The agreement states the total "may or may not include escrow." I have called Ocwen, who states they do not have our Borrower Authorization on file. I also left a voicemail for Kyle Timken. Payment is due 6/18/12 so it is crucial we have a response soon. Please advise. Thank you.

Regards,

*Chris Trionfo*

**Modification Specialist**

Cozmyk Law Offices, LLC

6100 Oak Tree Boulevard

Suite 200

Independence, OH 44131

Phone    (877) 570-4440

             (216) 373-2378

Fax       (216) 373-2378

ctrionfo@cozmyklaw.com





**DOUCET & ASSOCIATES CO., L.P.A.**
ATTORNEYS AT LAW

700 STONEHENGE PARKWAY
SECOND FLOOR
DUBLIN, OH 43017
614.944.5219
818.638.5548 FAX
TROYDOUCET.COM

August 26, 2015

**VIA CERTIFIED MAIL**

Ocwen Loan Servicing, LLC
P.O. Box 24736
West Palm Beach, FL 33416-4736

Re:  **Name on Account:**  Ray W. Askin
     **Loan Number:** ▮▮▮▮▮▮▮▮
     **Address of Property:** 3076 Fawn Crossing Drive, Hilliard, Ohio 43206

To Whom It May Concern:

Please be advised that I represent Ray W. Askin ("Mr. Askin") with respect to the above referenced account.  I have enclosed an executed copy of my client's authorization.

This letter is a qualified written request for information ("QWR") and notice of error, pursuant to the Real Estate Settlement and Procedures Act ("RESPA"), 12 U.S.C. 2605(e).  *See also* 12 C.F.R. 1024.35; 12 C.F.R. 1024.36.

NOTICE OF ERROR

Mr. Askin entered into a loan modification in 2012. Mr. Askin consistently made montly payments on the loan following the modification. According, Mr. Askin disputes the Past Due Amount of $2,915.64 the Outstanding Principal of $202,637.49, and the negative Escrow Balance of $15,758.59 as indicated on Mr. Askin's July 2015 Mortgage Statement. A copy of Mr. Askin's July 2015 Mortgage Statement is enclosed.  Mr. Askin disputes all late fees, charges, inspection fees, property appraisal fees, forced placed insurance charges, legal fees, and corporate advances charged to this account.  Furthermore, Mr. Askin believes his account is in error for the following reasons: the Outstanding Principal Balance and Escrow Balance due is erroneous due to excessive fees, costs, and interest and/or misappropriation of payments. Please remove all of the unauthorized fees, interest, and charges from Mr. Askin's account.

REQUEST FOR INFORMATION

In accordance with our client's rights under RESPA, our client hereby requests information about the fees, costs, and escrow accounting of his loan, including:

EXHIBIT E

August 26, 2015
Page 2 of 3

1. The name, address, and telephone number of the owner of the note, plus the name of the master servicer of the note.
2. The current physical location of the note.
3. Duplicates of any copies of the original note.
4. The date that the current note holder acquired the note and mortgage, and from whom they were acquired.
5. The date your firm began servicing the loan.
6. A complete payment history of how payments and charges were applied, including the amounts applied to principal, interest, escrow, and other charges.
7. The current interest rate on this loan and an accounting of any adjustments.
8. A statement of the amount necessary to reinstate this loan.
9. A complete copy of the loan closing documents, including a copy of the note and mortgage and documents showing transfers of the right to service the note and mortgage.
10. A copy of all appraisals, property inspections, and risk assessments completed for this account.
11. A copy of all invoices for legal fees charged to the account.
12. A written statement and supporting documentation explaining how the escrow was calculated prior to Mr. Askin entering into this loan, how the escrow was calculated immediately after Mr. Askin entered into this loan, and how the escrow is currently calculated. Please include the initial escrow account statement and each of the annual escrow account statements for this loan, pursuant to 24 CFR 3500.17.
13. A copy of all written correspondence you sent to Mr. Askin from January 1, 2012 to the present that addresses Mr. Askin's alleged delinquency or default on the Mortgage Loan.
14. A copy of all written correspondence, call logs, servicing logs, or audio recording that informed Mr. Askin of any mortgage assistance available, including but not limited to any application or documents referencing potential loan modifications, HAMP modifications, deeds in lieu, short sales, or cash for keys.
15. A copy of all written correspondence, call logs, servicing logs, or audio recording that includes information relating to your efforts to evaluate Mr. Askin for loss mitigation options, including but not limited to any application or documents referencing potential loan modifications, HAMP modifications, deeds in lieu, short sales, or cash for keys.
16. A copy of all written correspondence, servicing logs, internal communication logs, or policies and procedures that includes information regarding your efforts to verify the authenticity of Mr. Askin's note and mortgage, including any indorsements or allonges.
17. A copy of a new loss mitigation application.
18. Your preferred address for receiving QWRs and notices of error, if it differs from the address this QWR was sent to.

If you do not or are unable to provide Mr. Askin with this information, please specifically state why you are unable to provide this information.

August 26, 2015
Page 3 of 3

Pursuant to 12 U.S.C. 2605(e) and 12 C.F.R. 1024.35(i)(1), this letter serves as notice that placing any negative coding on our client's credit reports within 60 days of receipt of this QWR is
a violation of RESPA and the FCRA. Your organization will be subject to civil liability if you furnish adverse information to any consumer reporting agency regarding any payment that is the subject of this notice of error within 60 days of receipt of this QWR.

### TILA DEMAND

In accordance with the Truth in Lending Act, 15 U.S.C. 1641(f)(2), our client requests the name, address, and telephone number of the owner of his note, plus the name of the master servicer of his note.

Regards,

Andrew J. Gerling
Attorney at Law

AJG/pct
Encl: Authorization; July 2015 Mortgage Statement
cc: Ray W. Askin

2-814-01065-0000279-001-2-000-000-000-000



**Ocwen Loan Servicing, LLC**
WWW.OCWEN.COM
*Helping Homeowners Is What We Do!* ™

1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Toll Free: (800) 746 - 2936

09/03/2015

Loan Number: ▮▮▮▮▮▮▮

Doucet & Associates Co., L.P.A.
700 STONEHENGE PKWY
DUBLIN OH 43017-7574

Property Address: 3076 Fawn Xing Dr
Hilliard, OH 43026

Dear   Doucet & Associates Co., L.P.A.

OCWEN would like to take this opportunity to thank you for your recent communication regarding the above referenced loan. We appreciate the time and effort on your part to bring your concern to our attention. Pursuant to your concern, we have reviewed the loan and below is the recap of our response to the concern raised:

**Concern#1**   With reference to the borrower's (Ray W. Askin) above loan, you provided us with RESPA Qualified Written Request and requested us to respond to the queries outlined in the correspondence. You also provided us with a copy of the authorization letter and requested us to update our records accordingly.

**Response**   Pursuant to the correspondence, we have updated our records to reflect Doucet & Associates Co., L.P.A. and its associates as authorized to receive and discuss information regarding the loan.

Please note that in order to discuss the account information over the phone, an ATP needs to verify the loan number, borrower's name, last four (4) digits of the borrower's Social Security Number (SSN), property address and password (if any).

The loan was originated on February 23, 2006 for $229,500.00 by Bank of New York Mellon with the first (1st) payment due on April 1, 2006. As we were not involved in the origination of the loan, we cannot comment further regarding any concerns arising from the loan origination.

We acquired the servicing rights of the loan on April 7, 2012 from Saxon Mortgage Services Inc. with outstanding late charges in the amount of $3,100.89 and fees and expenses in the amount of $5,976.50.

A Note or a partial interest in the Note can be sold one or more times without prior notice to the borrower. Such a sale might result in a change in the entity known as the 'Loan Servicer' that collects periodic payments due under the Note and Mortgage and performs other mortgage loan servicing obligations under the Note, Mortgage and Applicable

NMLS # 1852                                                                                                    RRCMAINLTRM

*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is purely provided to you for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*

EXHIBIT F

2-814-01085-0000279-001-3-000-000-000-000



**Ocwen Loan Servicing, LLC**
WWW.OCWEN.COM
*Helping Homeowners Is What We Do!* ™

1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Toll Free: (800) 746 - 2936



Laws. Please note that we do not have any control over service transfer of loans.

We are obligated to service the loan in accordance with the terms of the Note and Mortgage the borrower signed. A review of the Note indicates that you (Ray W. Askin) have signed it and therefore, is responsible for the debt. As such, the above loan is valid.

We received your request for a copy of a non-collateral document. This includes documents pertaining to your loan but that are not utilized as security for your loan. An extensive search was conducted for the requested documents through our imaging system, collateral department, and the off-site document storage facility. Please note that some or all of the documents you requested are not available because they are not in our control or possession and we were unable to retrieve the documents through reasonable efforts. If the requested documents pertain to your loan origination, please contact your loan originator or the title company involved in the closing of your loan for further assistance

We have submitted a request for the Payment Reconciliation History to be sent to your attention, which reflects all credits and disbursements, made to the loan by us and the resulting loan status. Additionally, we have placed request for the loan documents to be sent to your attention. You will receive this under a separate cover.

Given below are the descriptions for transaction codes used:

Effective date: This is the date that we received the payment or disbursed the funds on the loan.

Description: This shows the type of the transaction that took place on that particular date.

Principal: This reflects the actual amount that has been applied toward the principal balance reduction. If the payment is reversed there will be a negative sign on that transaction.

Interest: This reflects the actual amount that has been applied toward the interest. If the payment is reversed there will be a negative sign on that transaction.

Suspense column: Please note that according to our payment posting procedure, any payment received will be first applied to the payment that is contractually due and then for any outstanding fees due on the loan. If the payment is not sufficient to make a full monthly payment, then it will be applied to the suspense (partial payment-credit) account until additional funds are received so as to make a full contractual payment. Therefore this column reflects that the balance placed in the suspense (partial payment-credit) account as of that date and the negative amount indicates the reversal and reapplication of that amount from the suspense account toward principal or interest.

Further, the transaction history consists of the following codes:

NLD: This code refers to the loan disbursement details. This code provides the details of the unpaid principal balance transferred and the details of the suspense (partial payment-credit) account balance transferred from the prior servicer.

EID/ETD: These codes provide the details of the insurance and tax disbursements.

EIC: This code provides the details of the amount credited to the escrow account assessed toward Lender Placed Insurance.

NMLS # 1852                                                                                    **RRCMAINLTRM**

*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is purely provided to you for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*

2-814-01065-0000279-001-4-000-000-000-000



**Ocwen Loan Servicing, LLC**
WWW.OCWEN.COM
*Helping Homeowners is What We Do!* ™

1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Toll Free: (800) 746 - 2936



R/RSP/RMS: These codes provide the details of the mortgage payments received on the loan.

MSA: These codes provide the suspense (partial payment-credit) account balance adjustment details.

PAS: This code provides the details about funds removed from forbearance suspense and applied toward the loan.

AFB: This code provides details about the forbearance payments applied toward the loan.

OAA: This code provides you details about advances adjustments made on the loan.

EXP: This code provides you details regarding payments that we applied toward the expenses.

PRP: This code provides you details regarding the payments that were applied towards principal reduction.

Our records indicate that the monthly mortgage payment on the loan is due on the first (1st) day of every month. However, according to Ocwen's late fee policy, borrower has fifteen (15) days grace period to make the monthly mortgage payments without being assessed a late charge. If the monthly mortgage payment is made after this grace period, a late charge equal to five (5%) of the overdue payment of principal and interest will be assessed on the loan.

Multiple payments were remitted after the 16th of the month, which was after the grace period. Late fees are assessed on all payments paid after the 16th of each month. As a result, the late charges assessed are valid.

As a result of the payment delinquency, fees were incurred by the servicers that were then assessed to the loan for repayment. The Payment Reconciliation History reflects all the outstanding fees or expenses, and provides a breakdown of all the fees assessed to the loan.

Given below is an explanation of the fees and expenses assessed to the loan:

Property Inspection Fee: Property Inspection fee is assessed when a property inspection is done on a delinquent loan to verify whether the property is occupied to insure against vandalism.

Attorney Fee and Collection Cost: Please note that whenever the loan becomes (30) thirty-day delinquent, a Notice of Default is sent to the borrower to advise him of the status of the loan. There is a $95.00 charge for this letter.

Foreclosure Attorney Fee: If you become delinquent on your loan and foreclosure is required, this fee may be charged for services rendered by Ocwen's legal counsel who handle the foreclosure case.

Depending on the complexity of the case, the total attorney fee may be assessed. Ocwen utilizes recognized industry guidelines, such as Fannie Mae and Freddie Mac, to assist in establishing acceptable limitations for attorney fees.

Title Report Fee: Please note that if the bank initiates a foreclosure action, the law requires all parties with interest in the property to be notified. In order to determine those parties that have an interest, a title search is required for which a fee is assessed. This fee is called the Title Report Fee.

Foreclosure Fee: Foreclosure Attorney Fee is fee(s) that are billed by Attorney that initiated the default and foreclosure process.

Please be advised that foreclosure proceedings may be initiated on a loan, when it is past due for one hundred and

*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is purely provided to you for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*

2-814-01085-0000279-001-6-000-000-000-000



**Ocwen Loan Servicing, LLC**
WWW.OCWEN.COM
*Helping Homeowners is What We Do!* ™

1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Toll Free: (800) 746 - 2936



twenty (120) days or more. However, this varies from state to state. Therefore, if the loan becomes delinquent on payments, Property inspection fee may be charged for an inspection of the property to make sure that it is still in good condition and to verify whether the property is occupied to insure against vandalism. In addition, a Property valuation is performed when the borrower defaults. A Property valuation fee may be charged for determining the value and condition of the property, using a certified Real Estate Agent. As of the date, the foreclosure proceedings are initiated on the property on May 22, 2015.

When a payment is not received within thirty (30) days from the due date, the loans are reported as delinquent to the credit bureaus.

A review of the loan indicates that certain payments were delinquent and that the credit reporting submitted correctly reflected the delinquent status. We are obligated to report true and accurate information to the credit bureaus and therefore the credit reporting cannot be changed. We report to Equifax, TransUnion, Experian and Innovis. These bureaus provide information to the local credit bureaus to update and correct your credit file. We are unable to control when the credit reporting agencies will update their records.

After reviewing the Payment Reconciliation History, if you continue to believe that we have made an error in the credit reporting of the loan; please send us a letter including the following information as applicable:

1) Identification of which month and what reporting is being disputed.
2) Explanation of why this month and reporting is being disputed.
3) All applicable evidence showing that your payment for that month was received on time or that the information we reported was incorrect.

You may forward the requested documentation to the address mentioned below or fax it to (407) 737-6375. Upon receipt of the requested information, we will review and research the issue further.

Even if the loan is not escrowed for taxes and/or insurance, if the taxes payable towards the property are delinquent or if we do not receive proof of insurance on the property for any given period, in order to protect our interest, we disburse the delinquent taxes and/or assess Lender Placed Insurance (LPI) to the property. This will result in a negative escrow balance and an escrow payment will be added to the monthly payment amount in order to collect the escrow advance.

The loan is escrowed with us for taxes and insurance. Please note that the monthly escrow payments are based on anticipated payments to be paid into the escrow account and anticipated payments to be made from the escrow account in addition to the amount of negative escrow balance on the loan (if any).

On August 4, 2015, we performed an escrow analysis on your loan. In accordance with the escrow analysis, the monthly mortgage payment, beginning with your payment due October 1, 2015, will be $1,997.29 of which $1,139.54 will be for principal and interest and $857.75 will go into your escrow account. We have placed a request for a copy of the escrow analysis performed on July 4, 2015, March 26, 2015 and August 4, 2015 to be sent to your attention, which you will receive under a separate cover.

The entity that currently owns the loan and holds the Note is NovaStar Mortgage Funding Trust, Series 2006-1 NovaStar Home Equity Loan Asset-Backed Certificates, Series 2006-1. The address of the entity is: Attn: CT MBS Group 525 William Penn Place 7th Floor, Pittsburgh, PA 15259, and the phone number is: (800) 269-6776. The entity that currently owns the loan is based upon Ocwen's review of its records as of the date of this letter and the ownership status may change throughout the life of the loan. Ocwen Loan Servicing, LLC is currently servicing your loan and all

---

NMLS # 1852                                             **RRCMAINLTRM**

*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is purely provided to you for informational purposes only with regard to our secured item on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*

2-814-01055-0000279-001-6-000-000-000-000



**Ocwen Loan Servicing, LLC**
WWW.OCWEN.COM
*Helping Homeowners is What We Do!* ™

1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Toll Free: (800) 746 - 2936



inquiries should be directed to our office.

We have submitted a request for the reinstatement quote good through October 2, 2015, to be sent to your attention. This will provide you with the total amount required to reinstate the loan as of the good through date. For further breakdown and other details please refer to the reinstatement quote. If you have not received the reinstatement quote, please visit to www.Ocwen.com. Please be advised there may be fees and expenses that are incurred, which will be assessed to the loan on a later date.

Please be advised that, a request has been placed for a payoff quote good through October 2, 2015 to be sent to your attention. This will reflect the total amount required to payoff the loan as of the given good through date.

If you believe that there is any discrepancy in the aforementioned information, please provide us with the relevant documentation in order for us to research the issue. You may forward the requested proof to the address referenced below or fax it to (407) 737-6375.

Please note that Ocwen services loans in accordance with all applicable federal and state laws. Section 2605(e) of the Real Estate Settlement Procedures Act requires that Ocwen respond to "qualified written requests," as defined by that section, regarding "information relating to the servicing of such loan", 12 U.S.C. § 2605(e)(1)(A). Ocwen will not respond to questions that do not relate to the servicing of this particular loan. For any further assistance, you may contact our Collateral Based Solutions at (888) 554-6599.

As of the date of this letter, the loan is due for the September 1, 2013 payment with an unpaid principal balance in the amount of $202,637.49, and the negative escrow balance is in the amount of $15,758.79.

For any questions or concerns regarding the loan, you may contact our Customer Care Center at (800) 746-2936.

We trust the information provided has fully addressed your concern. Please visit our website (www.ocwencustomers.com) which is available 24 hours a day, seven days a week, as many of the answers to your account specific questions may be found there. However, should you have any further questions in regards to this issue, please contact our Research Department at (800) 241-9960. If after speaking with our Research Department you still have questions or concerns, please feel free to contact the OCWEN consumer advocate by email through OCWEN's website or by phone at (800) 390-4656. You may also send written correspondence to the following address:

Ocwen Loan Servicing, LLC
Attention: Research Department
P.O. Box 24736
West Palm Beach, FL 33416-4736

Sincerely,
Londhe, Yogeshkumar
Research Department

NMLS # 1852                                                                                    RRCMAINLTRM

*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is purely provided to you for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*

Page 5 of 6

2-814-01065-0000279-001-7-000-000-000-000



**Ocwen Loan Servicing, LLC**
WWW.OCWEN.COM
*Helping Homeowners Is What We Do!* ™

1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Toll Free: (800) 746 - 2936

Ocwen Loan Servicing, LLC



NMLS # 1852                                                                RRCMAINLTRM

*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is purely provided to you for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*

Page 6 of 6



2-814-01065-0000279-001-1-000-000-000-000
Doucet & Associates Co., L.P.A.
700 STONEHENGE PKWY
DUBLIN OH 43017-7574





OCWEN

P.O. Box 24646
West Palm Beach, FL 33416-4646

PRESORTED
FIRST-CLASS MAIL
U.S. POSTAGE PAID
VE LTD

FIRST CLASS MAIL

RECEIVED
SEP 14 2015

29 HMGYNP1 43017